IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 90-cr-00130-PAB-01
Criminal Case No. 09-cr-00367-PAB-01

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. MIGUEL ANGEL CARO-QUINTERO,

        Defendant.

---

## RULE 11(c)(1)(C) AND (B) PLEA AGREEMENT AND STATEMENT OF FACTS RELEVANT TO SENTENCING

---

The United States of America, by Acting United States Attorney for the District of

Colorado David M. Gaouette, through the undersigned Assistant United States Attorneys, and

the undersigned  U.S. Department of Justice Trial Attorney (Government), and the defendant,

MIGUEL ANGEL CARO-QUINTERO (Defendant), personally and by counsel, Walter B.

Nash III, Esq., Stephen G. Ralls, Esq., and John M. Richilano, Esq., respectfully submit the

following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to

D.C.COLO.LCrR 11.1 and Fed.R.Crim.P. 11(c)(1)(C) and (B).

### I. PLEA AGREEMENT

Subject to the terms and provisions of Rule 11(c)(1)(C), with respect to the sentences to

be imposed in Case No. 90-cr-00130-PAB-01, (Colorado Case) and Case No. 09-cr-00367-PAB-

01, a case transferred to the District of Colorado (Arizona Case), the parties respectfully submit

this proposed plea agreement asking the Court to impose a sentence which will result in a

COURT
EXHIBIT
1

period of imprisonment of not less than ten (10) years and not more than twenty (20) years, to be

followed by a period of supervised release up to 5 years, a mandatory assessment of $100.00 for

each count of conviction, and such fine as the Court may impose. By operation of Rule

11(c)(1)(C), if the Court determines that a sentence outside the agreed to range will be imposed,

the Defendant may withdraw his pleas of guilty and the defense and the Government may

withdraw from this plea agreement. The sentences to be imposed on each Count herein shall be

concurrent with one another.

*Arizona Case*. The Defendant and the Government agree to the Rule 20 transfers of the

August 31, 1994, Superseding Indictment in District of Arizona Case Number 94-205-TUC-JMR

(Arizona Case), and District of Arizona Cases Nos. CR 88-256-TUC-FRZ and CR 94-396-TUC-

JMR. The Defendant agrees to plead guilty to Count One of said District of Arizona Superseding

Indictment in Case Number 94-205-TUC-JMR, alleging his voluntary and knowing participation

in a conspiracy to knowingly possess with intent to distribute a quantity of Marijuana on or about

November 1993 through August 1994, within the District of Arizona, in violation of 21 U.S.C. §§

841(a)(1) and 846. All other Counts in Case Number 94-205-TUC-JMR and the Indictments in

District of Arizona Cases Nos. CR 88-256-TUC-FRZ and CR 94-396-TUC-JMR shall be

dismissed with prejudice as to the Defendant Caro-Quintero only at the time of sentencing herein

if the Courts accepts this Agreement.

*Colorado Case*. Defendant agrees to plead guilty to Count One (Conspiracy to Violate the

Racketeer Influenced and Corrupt Organizations Act - "RICO Conspiracy") of the Second

Superseding Indictment. Count One charges a RICO Conspiracy violation of 18 U.S.C. §§ 1961,

1962, and 1963 -- knowingly conspiring to participate in the conduct of a pattern of racketeering

activity in violation of the terms of the Racketeer Influenced Corrupt Organization Act, including

violations of Title 21 U.S.C. § 841(a)(1) and (b)(1)(B), knowingly to possess with intent to

distribute and knowingly distributing more than 100 kilograms of a substance and mixture

containing a detectable amount of marijuana, during the period of on or about January 1983

through or about December 1993.

If the Court accepts the Defendant's pleas of guilty to Count One of the Colorado case and

Count One of the Rule 20 transfer Arizona case 94-205-TUC-JMR, at or before the time of

sentencing, the Government will enter a motion to dismiss the remaining charges as to this

defendant only in the above captioned District of Colorado case.

*Other Charges.* This agreement is intended to be a global resolution of all criminal

involvement of this defendant in the United States or in Mexico which such involvement could

result in charges in the United States. The parties believe applicable statutes of limitations bar

any other new charges from being filed against this Defendant in any jurisdiction in the United

States; the defendant has been in custody since December 20, 2001. The order of extradition

(which applies only to this case presently pending in the District of Colorado and Arizona Case

Numbers 94-205-TUC-JMR and CR 94-396-TUC-JMR) bars this Defendant from being tried for

any other charges in the United States. The parties are aware of no other pending charges

anywhere in the United States, state or federal, against this Defendant.

*1994 Arizona Case.* **Count One – Elements of the Conspiracy Offense**

To prove the Defendant guilty of the offense charged in Count One of District of Arizona

case number 94-205-TUC-JMR, one of the Rule 20 transfer cases, the Government must prove

beyond a reasonable doubt that:

*First*:          Defendant Miguel Angel CARO-QUINTERO;

*Second*:      Knowingly agreed with one or more persons;

*Third*:        To knowingly possess with intent to distribute a quantity of Marijuana;

*Fourth*:       Within the District of Arizona; and

*Fifth*:         Did so on or about the dates alleged, November 1993 through August 1994.

### *Colorado Case.* Count One -- Elements of the RICO Offense

According to the Tenth Circuit's Pattern Jury Instructions (2005), in order for a jury to find the Defendant guilty of the crime charged in Count One, the jury must be convinced that the government has proved each of the following elements beyond a reasonable doubt:

*First*:          Between January 1978 to on or about July 21, 1988, the Defendant knowingly agreed to join an enterprise in fact which existed as alleged in the indictment;

*Second*:      The enterprise affected interstate or foreign commerce;

*Third*:        The Defendant knowingly was associated with or employed by the enterprise;

*Fourth*:       The Defendant knowingly engaged in a pattern of racketeering activity; and

*Fifth*:         The Defendant knowingly conducted, or knowingly participated in the conduct of, the enterprise through that pattern of racketeering activity.

## II. **STATUTORY PENALTIES**

The maximum statutory penalty for Count One, RICO Conspiracy in violation of 18 U.S.C. §§ 1961, 1962 and 1963, is imprisonment for not more than twenty (20) years (or for Life if the racketeering activity includes a maximum penalty of life imprisonment), a fine of not more than $250,000.00, or both; there is a mandatory $100.00 special assessment fee; and the Court may impose a period of supervised release of not more than five (5) years.

The maximum statutory penalty for Count One, Conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, is imprisonment for not more than five (5) years, a fine of not more than $250,000.00, or both; there is a mandatory $100.00 special assessment fee; and the Court is required to impose a period of supervised release of at least two (2) years.

Pursuant to 18 U.S.C. § 3584, terms of imprisonment may run consecutively or concurrently when sentences are imposed on multiple counts of conviction. This Agreement requires concurrent sentences if the Agreement is accepted by the Court. By statute, when sentences are imposed at the same time, sentences to multiple terms of imprisonment run concurrently unless the court orders or a statute mandates that the terms are to run consecutively. The conviction of a felony offense may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury. A violation of the conditions of supervised release may result in a separate prison sentence. Additionally, after a final conviction based on a plea of guilty to a felony offense, such conviction may cause the Defendant to be deported from the United States following completion of any period of imprisonment.

The Government respectfully asserts that the calculation of credit for time served in

pretrial confinement is a matter for the U.S. Bureau of Prisons. The Government is opposed to the Court's determination of credit for time served in pretrial confinement as a part of the defendant's sentencing. The defendant reserves the right to ask the Court to make findings with respect to pretrial confinement. The Government acknowledges that the Court has previously made findings regarding credit for pretrial confinement as a part of the sentencing process for other defendants in this case. Provided the U.S. Bureau of Prisons determines the defendant meets the requirements set forth in Title 18, United States Code, Section 3585(b)(1) and (2), which require inter alia that the time "has not been credited against another sentence," the parties expect that the defendant will receive credit for time served in official detention in the United States since his extradition and in Mexico while awaiting extradition to the United States pursuant to the official request for extradition. The parties agree that the defendant was arrested on an extradition warrant in Mexico on December 20, 2001, and has remained in official detention in Mexico or the United States since that time.

The defendant shall have the right to later request relief from this Court in the event the U.S. Bureau of Prisons denies credit for presentence confinement in a manner not commensurate and consistent with treatment given other defendants in related cases, not in conformance with applicable law, or at variance with the express or implied terms of any order of the Court herein. The Government reserves the right to oppose the granting of any such relief.

### III. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree there is no dispute as to the material elements that establish a factual basis for the offenses of conviction. However, the parties respectfully advise the Court that the parties do not agree on the application of USSG §1B1.3 principles regarding relevant offense

conduct in this case. Regarding the scope, nature and extent of relevant offense conduct for

purposes of Sentencing Guidelines calculations, the parties may call witnesses, make proffers,

offer evidence, and advance arguments in support of their positions at the time of sentencing. The

parties agree that the Sentencing Guidelines are advisory in nature and that the Court will impose a

sentence pursuant to the factors and terms of 18 U.S.C. §§ 3553(a) and 3584. Pertinent facts are

set out below in order to provide a factual basis for the plea and to provide some of the facts that

the parties believe are relevant, pursuant to USSG § 1B1.3, for computing the appropriate

guideline range. Because there is some disagreement between the parties about the facts relevant

to sentencing, the parties have tried to identify for the Court facts known to be in dispute at the

time of the plea. USSG § 6B1.4(b). The parties again here inform the Court that each side

reserves the right to dispute, by argument and the presentation of evidence, or otherwise, the

applicable limits of relevant offense conduct for purposes of USSG § 1B1.3 determinations by the

Court.

The parties acknowledge that these facts are those the Government believes it can prove at

trial and that some of the facts took place outside of the 1985-1988 time frame during which

Miguel Caro-Quintero, Harold Hughes, Robert Mackesy and others were involved in the conduct

charged in Count One. Some of the activity by Hughes, for example, took place before Hughes

met Rafael or Miguel CARO-QUINTERO. The parties agree that the Defendant Miguel CARO-

QUINTERO participated in numerous acts recited herein, they also agree that he did not

participate in or have knowledge of each and every matter set out in this document.

The statement of facts herein does not preclude either party from presenting or arguing,

for sentencing purposes, additional facts or factors not included herein that are relevant

to the guideline computations, USSG § 1B1.3, or to sentencing in general pursuant to the terms and factors of Title 18 U.S.C. § 3553(a). USSG § 1B1.4. provides, in part: "[I]n determining the factual basis for the sentence, the Court will consider the stipulation [of the parties], together with the results of the presentence investigation, and any other relevant information." USSG § 6B1.4, comment.

The Government's evidence would show that the date on which conduct relevant to the offense (USSG § 1B1.3) began is on or about January 1983 and continuing until on or about April 1994. The Government agrees that the involvement of the Defendant Caro-Quintero was from on or about 1985 through 1988 for the Colorado case and 1993-1994 in the Arizona case.

The Defendant admits that he was involved as a source of supply of marijuana as charged in Count One of the Arizona superseding indictment and Count One of the Colorado superseding indictment. Regarding Count One of the Arizona superseding indictment, the Defendant admits that the men arrested and convicted in relation to more than 1000 kilograms of marijuana delivered in Arizona worked for the Defendant. Regarding the Colorado charges, the Defendant admits he was *a* source of supply of quantities of marijuana between 1985 and 1988 for the RICO enterprise in fact (involving Harold Hughes, Robert Mackesy and others) as described in Count One of the Colorado case, but the Defendant contends that Hughes, Mackesy and others had alternative sources of supply for the RICO enterprise in addition to the Defendant. Accordingly, the Defendant reserves the right to contest the quantity of marijuana properly attributable to the Defendant as relevant offense conduct under the application principles of USSG § 1B1.3.

The Government respectfully asserts that the evidence pertinent to sentencing, in brief, would be as follows:

***1994 Arizona Case***:  The general facts outlining the offense charged in Count One of the 1994 Arizona Rule 20 Transfer case are here set forth:   A cooperating individual who had a substantial history of marijuana trafficking with the Defendant began cooperating with DEA investigators in 1993.  The cooperating individual arranged an introduction of a DEA undercover agent to persons working for and with the Defendant.  In November 1993, the DEA undercover agent met representatives of the Defendant in Tucson, Arizona.  The men discussed smuggling tons of marijuana from Mexico to the United States where it would be delivered to the undercover agent.  As the months passed, phone calls between the cooperating individual and the Defendant took place and were recorded by investigators.  Eventually, more than 1000 kilograms of marijuana were delivered in the United States to undercover investigators by men working for and with the Defendant.  Communications were thereafter recorded between the Defendant, the cooperating individual, and an undercover DEA agent concerning the quality of the marijuana and payment for the marijuana which had been delivered.  Eventually two men working for and with the Defendant were arrested in the United States and prosecuted in the United States in relation to the marijuana shipments.  On or about April 11, 1995, one of the Defendant's workers convicted in District of Arizona Case No. 94-205-TUC-JMR was sentenced to 96 months of imprisonment on Count One, to be followed by 60 months of supervised release. On or about April 27, 1995, the other man convicted in District of Arizona Case No. 94-205-TUC-JMR was sentenced to 36 months of imprisonment on Count One, to be followed by 60 months of supervised release.

*Colorado Case*:  Beginning in1989, Government investigators became involved in the investigation of a marijuana smuggling organization then headed by Miguel Angel CARO-QUINTERO and involving Harold Allen HUGHES in relation to the District of Colorado. Government investigators determined that Rafael CARO-QUINTERO, Harold Allen HUGHES and other co-conspirators were involved in the narcotics[1] trafficking business going back to the late 1970's.  Miguel Angel CARO-QUINTERO was born in 1963 and had some involvement with the organization headed by his brother Rafael in approximately 1980.  When Rafael CARO-QUINTERO was arrested in 1985, Miguel CARO-QUINTERO assumed a more prominent role in the organization.  Investigators determined that the CARO-QUINTERO organization was responsible for the distribution of many tons of marijuana throughout the United States. In general, the marijuana was smuggled into the United States from Mexico by members of the organization and others. During the course of this investigation, Government investigators had the opportunity to interview numerous witnesses, review reports and affidavits authored by other law enforcement officers investigating marijuana smuggling in the Southwestern United States and elsewhere, and to discuss other related marijuana smuggling investigations with fellow law enforcement officers.

During the investigation, through interviews with witnesses/sources of information, Government investigators learned that Miguel Angel CARO-QUINTERO was a large scale source of marijuana in Mexico for co-conspirators and associates receiving and distributing ton quantities of marijuana within the United States on a repeated basis, representing a sustained

---

[1]  The term "narcotics" in the context of this plea agreement is being used in a broad sense to denote and connote illegal trafficking in controlled substances, to include marijuana.

pattern of criminal activity. HUGHES worked closely with Miguel Angel CARO-QUINTERO.

HUGHES acted as a point of contact for the venture, functioning as a coordinator, broker and go-

between for CARO-QUINTERO and associates in the United States. The Government asserts that

all the marijuana Hughes obtained in the 1985-1988 time frame was from Miguel CARO-

QUINTERO.

On or about June 19, 1990, Government investigators interviewed a cooperating source of

information (hereinafter referred to as S-1) concerning the narcotics activities of HUGHES and his

associates. S-1 informed Government investigators that S-1 has known Harold HUGHES since

1979 and S-1 has been involved with Harold HUGHES in the distribution of narcotics. S-1 has

also advised that S-1 has met several individuals involved with HUGHES in the smuggling and

distribution of narcotics.

S-1 met Robert Ayer MACKESY, who distributed marijuana provided by HUGHES in the

United States, and several of MACKESY's associates. S-1 also met Antonio Jose VILLARREAL-

Ulloa, who transported money from the United States to Mexico for HUGHES. S-1 also met

several of the pilots used by HUGHES to fly loads of marijuana from Mexico into the United

States. S-1 also met HUGHES's close associate Rene Martin VERDUGO, who was part of the

CARO-QUINTERO Organization and now is incarcerated in the United States.

S-1 informed Government investigators that the first time S-1 met MACKESY was around

April 1986 in Santa Fe, New Mexico. S-1 was attempting to obtain false identification for S-1,

and HUGHES referred S-1 to MACKESY.

S-1 told Government investigators that in approximately March 1987, S-1 contacted

HUGHES in Mexico by telephone from Colorado and S-1 told HUGHES that S-1 needed some

marijuana to sell in order to earn some money. HUGHES told S-1 that HUGHES had

approximately 1,000 pounds of marijuana in Scottsdale, Arizona, which HUGHES offered to sell

to S-1 for a price of $1,200.00 per pound. HUGHES gave S-1 MACKESY's pager number and

told S-1 to contact MACKESY. HUGHES told S-1 that MACKESY would arrange for the

marijuana to be delivered to S-1.

Government investigators were told that on the next day, S-1 and a companion arrived in

Scottsdale, Arizona. S-1 utilized the pager number provided to S-1 by HUGHES and contacted

MACKESY. S-1 and MACKESY arranged to meet at the Red Robin Restaurant in Scottsdale. S-1

stated that S-1 met MACKESY and another individual identified as Douglas McPheron, a/k/a

Douglas PECK. S-1 told MACKESY that S-1 only wanted 100 pounds of marijuana. S-1 told

Government investigators that MACKESY and McPheron left with S-1's motorhome and returned

within one hour with approximately 110 pounds of marijuana in the motorhome.

Government investigators learned that S-1 then left Scottsdale and drove to Flagstaff,

Arizona, where S-1 spent the night. The next day, S-1 met with one of S-1's customers, and S-1

gave the customer approximately 50 pounds of marijuana to sell on consignment. Government

investigators learned that upon leaving Flagstaff, S-1 drove to Page, Arizona, where S-1

distributed another 50 pounds of marijuana to another customer for resale. S-1 stated that S-1 then

returned to Colorado with approximately 10 pounds of marijuana still in S-1's possession.

Government investigators learned from S-1 that in approximately April 1987, S-1 had

received payment for the marijuana from one of S-1's customers. This money, along with money

from other marijuana loads belonging to HUGHES which had been sold by S-1, was taken to

Tucson, Arizona, by S-1. S-1 told Government investigators that once in Tucson, S-1 met with an

individual named Tony (later identified as Jose Antonio VILLARREAL-Ulloa, a/k/a Antonio Hernandez). S-1 stated that VILLARREAL-Ulloa took the money across the border into Mexico and gave the money to HUGHES in payment for the marijuana.

S-1 told Government investigators that S-1 dealt with VILLARREAL-Ulloa for approximately five to six months. S-1 estimated that during 1987, approximately six million dollars were delivered to VILLARREAL-Ulloa for delivery to HUGHES. Between May and July 1988, approximately two more million dollars were delivered to VILLARREAL-Ulloa by S-1.

S-1 told Government investigators that in late 1987, HUGHES began delivering loads of marijuana obtained from Miguel Angel CARO-QUINTERO to the St. George, Utah, area via aircraft. S-1 stated that S-1 as well as MACKESY were picking up loads of marijuana in St. George, Utah after it was flown into the United States from Mexico by HUGHES's aircraft. S-1 stated that one of the aircraft used by HUGHES to smuggle marijuana into the St. George, Utah area was abandoned by the pilot and seized by law enforcement authorities. Government investigators verified this information through U.S. Customs case number FF13MZ9FF001.

Government investigators learned from S-1 that HUGHES told S-1 that one of MACKESY's loads of marijuana had been seized by law enforcement officers and MACKESY's driver had been arrested in December of 1987. MACKESY later told S-1 that one of his (MACKESY's) drivers named "Brian" (later identified as Brian BAILIA, a/k/a Brian Williams) had been arrested at a roadblock in Utah. Investigators eventually learned that the load of marijuana taken at the roadblock was intended for MACKESY and an associate named Ronald FISHMAN.

Government investigators reviewed reports completed by the Salt Lake City DEA office as well as the Utah Highway Patrol and the Emery County, Utah, Sheriffs Department detailing the December 3, 1987, seizure of approximately 1,200 pounds of marijuana which was discovered as a result of a roadblock on Interstate 70. In reviewing the above-mentioned reports, Government investigators learned that officers working the roadblock arrested "Brian WILLIAMS" after officers located marijuana in the vehicle BAILIA was driving. BAILIA was driving a Chevrolet pick-up truck registered in the State of Nevada to George Gray.

Government investigators conducted a vehicle title history search of the above vehicle and learned that the vehicle was purchased on January 11, 1986, at Spedding Chevrolet in Denver, Colorado, by Thomas GRIEK, using the false name of Thomas GALE. Government investigators learned that Thomas GRIEK was Robert MACKESY's "right-hand man" and GRIEK, as part of his duties in the MACKESY enterprise, was often responsible for obtaining vehicles to be used to transport marijuana as well as for obtaining residences to be used to store marijuana. Government investigators learned that after purchasing and registering the vehicle (later driven by BAILIA during the December 3, 1987, seizure) in Colorado in the name of Thomas Gale, the vehicle was re-registered in Nevada, in the name of George Gray. The vehicle, however, at all times up to the seizure at the roadblock, remained the property of the MACKESY organization.

Government investigators learned that Brian BAILIA, using the false name of "Brian WILLIAMS," was sentenced to probation for possession of marijuana as a result of the December 3, 1987, seizure. Government investigators learned that BAILIA completed his probation in the State of Utah under the assumed name and that his true identity was never revealed to Utah authorities.

S-1 told Government investigators that (in February 1988) approximately two months after the load of marijuana had been seized in Utah, S-1 received a telephone call from HUGHES. S-1 was informed by HUGHES that his Mexican source of marijuana, Miguel Angel CARO-QUINTERO, wanted his money for the load that had been seized in Utah and HUGHES needed the money immediately. S-1 told Government investigators that MACKESY had failed to pay HUGHES for the load that was seized.

S-1 told Government investigators that HUGHES instructed S-1 to go to Pagosa Springs, Colorado, and obtain $1,200,000.00 which was buried at a residence belonging to a Mark Winter. S-1 stated that the money had been buried in August of 1981.

Upon HUGHES' demand, S-1 traveled to Pagosa Springs, Colorado and S-1 dug up the money on Winter's property. S-1 discovered that there was only approximately $850,000.00 left of the original $1,200,000.00. S-1 told Government investigators that S-1 contacted HUGHES and advised HUGHES of the shortage. S-1 stated that HUGHES became very upset but that there was nothing HUGHES could do, as he was in Mexico. Government investigators verified this information by recovering the plastic pipe which had contained the money recovered by S-1 from Pagosa Springs, Colorado.

S-1 advised that S-1 then traveled to Tucson, Arizona, where S-1 met with VILLARREAL-Ulloa. S-1 gave the $850,000.00 to VILLARREAL-Ulloa. VILLARREAL-Ulloa was to transport the cash across the border and deliver it to HUGHES so HUGHES could pay CARO-QUINTERO for the marijuana seized in Utah.

On February 4, 1992, Government investigators interviewed a source of information hereinafter referred to as S-2. S-2 told Government investigators that in 1977, S-2 moved to Caborca in the state of Sonora, Mexico.

In approximately 1982 or 1983, S-2 heard that the CARO-QUINTERO Organization had extensive real estate holdings in the area of Caborca, Mexico, upon which the CARO-QUINTERO Organization was growing marijuana. S-2 stated that the marijuana was being grown on ranches belonging to friends, relatives, and associates of Rafael and Miguel Angel CARO-QUINTERO.

In 1985, Enrique ACOSTA-CASTRO, an irrigation pump service person known to S-2 approached S-2 about running the business office for several area ranches. S-2 then began running the business office for "CATTLEMEN ASSOCIATED," a group of area cattle ranchers. S-2 stated that all of the ranches were owned by CARO-QUINTERO relatives such as cousins, brothers-in-law, etc.

While working at the association, S-2 took orders from both Miguel Angel CARO-QUINTERO and ACOSTA-CASTRO. After a short time S-2 quit and went back to ranching. In April 1986, ACOSTA-CASTRO asked S-2 to go to Tijuana, Mexico in order to pick up some money. S-2 drove from Caborca to Tijuana in a Volkswagen "Beetle" that was provided by ACOSTA-CASTRO.

One week later, S-2 made an additional trip to Tijuana at ACOSTA-CASTRO's request. S-2 stated that he hauled $700,000.00 each trip and made $7,000.00 each trip for hauling the money.

In July 1986, ACOSTA-CASTRO directed S-2 to go to Phoenix, Arizona in order to pick up some money. S-2 was given a pager number and told how to operate the pager. Upon arriving in Phoenix, S-2 called the pager and whoever returned the call told S-2 that he would be met. S-2 recalls being met by "WOODY" (Thomas GRIEK-identified by photo) at which time S-2 and GRIEK took the Volkswagen S-2 was driving to a mini-storage complex. S-2 pulled the vehicle into one of the storage lockers and S-2 and GRIEK hid $500,000.00 in U.S. currency in the vehicle.

Upon returning to Mexico, S-2 was introduced to Harold HUGHES, a.k.a. Mike COOPER. S-2 was told that HUGHES had some trouble in the United States and had recently moved to Caborca from Baja. S-2 later learned that HUGHES fled Baja, Mexico when Rene VERDUGO was arrested.

Approximately two weeks after his initial meeting with GRIEK, S-2 was asked by HUGHES to go to Phoenix and meet GRIEK again. S-2 drove to Phoenix where he again paged and was met by GRIEK. S-2 picked up $500,000.00 from GRIEK and he returned to Caborca, delivering the money to HUGHES. S-2 was paid $5,000.00 for driving the $500,000.00.

In September 1986, S-2 collected between $300,000.00 and $500,000.00 from GRIEK for HUGHES and, in October 1986, S-2 collected another $300,000.00 to $500,000.00 from GRIEK for HUGHES. On or about November 1986, through January 1987, S-2 said that he picked up between $300,000.00 and $400,000.00 from GRIEK about every 15 days.

S-2 also met "Joe Bob" (Joe Neal OTTER), who sold marijuana for HUGHES. S-2 recalls meeting OTTER on one occasion when OTTER had so many personal items (such as clothes, etc.) for S-2 to deliver to HUGHES that S-2 had to make two trips between Arizona and

Caborca.  OTTER also gave S-2 $500,000.00.  The cash and the personal items given to S-2 by OTTER were all delivered to HUGHES.

In January 1987, S-2 met "Bob" (Robert MACKESY- identified by photo) and "Ron" (Doug MCPHERON - identified by photo) in Phoenix.  HUGHES told S-2 that MACKESY was "the boss" and that he was very rich.

In February 1987, S-2 met OTTER between Tucson and Phoenix, at which time OTTER gave S-2 $50,000.00.  S-2 delivered the money to HUGHES and HUGHES passed the money on to Miguel Angel CARO-QUINTERO, to whom HUGHES told S-2 the money belonged.

In early 1987, S-2 picked up MACKESY and GRIEK in Tucson and transported them to Caborca to meet with HUGHES.  S-2 recalls the meeting lasted only a day or so.  S-2 stated that he transported around $850,000.00 to HUGHES that was obtained from SEIFERT and MCPHERON during April 1987.  In April 1987, HUGHES's office/shop and Miguel Angel CARO-QUINTERO's residence were bombed.  S-2 recalls it occurring around April 12, 1987. HUGHES then moved to Rocky Point, Mexico.

In May 1987, S-2 picked up a load of cash from OTTER in Tucson. S-2 recalls that the money was wet and moldy and OTTER told S-2 that the money had been buried in the ground. OTTER also told S-2 that the money was short as some had been taken while it was buried.  S-2 believes that only he, OTTER and HUGHES knew about the money being short.  S-2 believes that OTTER gave him about $700,000.00.

S-2 stated that on or about January, through April of 1987, he collected between $300,000.00 and $500,000.00 about two times per month from both OTTER and MACKESY.  On or about May through July 1987 S-2 collected only about $100,000.00 from each of the

groups. S-2 then collected a large payment in July and August. S-2 believed that it was between

$500,000.00 and $800,000.00. On or about September through October 1987, S-2 picked up

between $100,000.00 and $200,000.00 two times per month as a down payment on the next

growing season. By November 1987, S-2 was back collecting $300,000.00 to $500,000.00 every

two weeks from both OTTER and MACKESY groups. This pattern continued until about August

1988.

In the summer of 1987, Francisco COLLINS-AVILA, a.k.a. El Gordo, joined HUGHES as

a partner. COLLINS-AVILA provided transportation for the Marijuana to the U.S. S-2 stated that

COLLINS-AVILA controlled airstrips and provided ground crews supporting the transportation of

the marijuana.

In August 1988, OTTER called HUGHES and told him of OTTER's arrest. HUGHES

then told S-2 to meet OTTER in Phoenix to collect some money from him. S-2 told HUGHES

that he did not want to meet OTTER but HUGHES convinced him to do it. After OTTER and S-2

had made the exchange, S-2 began driving towards the border. S-2 was stopped by law

enforcement in the United States and the money seized. S-2 was released. S-2 went back to

Caborca and told HUGHES what had taken place.

S-2 was asked if he had ever met a pilot who worked for HUGHES named "GREGORIO."

S-2 stated that he had met the pilot on several occasions and that he was an American named

Gregory, later identified as Gregory PETTIJOHN.

On or about December 1987 through January 1988, S-2 was informed that PETTIJOHN

flew a plane into the St. George, Utah area. The plane got cold and would not re-start, forcing

PETTIJOHN to abandon the airplane. United States Customs, Flagstaff, Arizona confirmed

that in January 1988, an airplane that has been linked to PETTIJOHN was seized from a clandestine landing strip in Mojave County, Arizona. Mojave County, Arizona is located along the Arizona-Utah border South of St. George, Utah.

S-2 was then asked about the relationship between HUGHES and Miguel Angel CARO-QUINTERO. S-2 stated that it was obvious to him that HUGHES obtained his marijuana from CARO-QUINTERO. S-2 said that HUGHES would talk badly about Miguel CARO-QUINTERO when HUGHES would get poor quality marijuana loads. S-2 stated that he saw Miguel Angel CARO-QUINTERO and Enrique ACOSTA-CASTRO together with HUGHES on several occasions.

S-2 then spoke about attempting to meet an unknown male subject in the U.S. shortly after HUGHES had six kilograms of Cocaine seized by the Mexican Federal Judicial Police. HUGHES told S-2 to contact a party who was holding some rare rugs and paintings in the United States. When S-2 made telephone contact with the subject, the subject would not talk to him and he told S-2 to never call him again.

S-2 was then asked about a storage locker that he had rented in Tucson under his alias. S-2 said that he used the locker to store items that he had purchased in the United States for HUGHES. S-2 said that he stored things such as tires, pumps, food, camouflage clothing, weapons and ammunition. HUGHES even had a tennis court built for Miguel Angel CARO-QUINTERO by a company from Phoenix.

On March 4, 5, and 7, 1991, Government investigators debriefed a source of information hereinafter referred to as S-4, concerning Robert MACKESY's history in the marijuana trafficking business. S-4 stated that MACKESY grew up in the Miami, Florida, area and became

aware of numerous people involved in the importation and distribution of narcotics. In or about 1975, MACKESY began to distribute marijuana from in or around Florida.

In the spring of 1985, MACKESY traveled to Mexico where MACKESY met with Harold HUGHES for the purpose of water-skiing. MACKESY had been introduced to HUGHES by Gerald CUMMINGS, a.k.a. Jim BRADSHAW, sometime in 1984. MACKESY was introduced to CUMMINGS by a friend in Santa Fe, New Mexico, Mark ZAPLIN. MACKESY had planned on attempting to use HUGHES as a back-up source for marijuana.

In or about late 1985, MACKESY moved his operation west in order to utilize HUGHES as MACKESY's primary source of supply. The first loads of marijuana provided to MACKESY by HUGHES were flown into Arizona and California along the Mexican border. MACKESY's employees would travel into the desert in order to off-load the marijuana from the aircraft. S-4 recalled that the pilot utilized by HUGHES was "Gregorio," later identified as Gregory PETTIJOHN. S-4 believes PETTIJOHN was from the Tucson, Arizona area. MACKESY's sole source of supply in 1985 and 1986 was HUGHES.

The marijuana would enter the country from Mexico and be taken to a stash house in Phoenix, Arizona. From Arizona, loads of marijuana would then be driven to one of the Boulder, Colorado area stash locations. From the Colorado stash locations, marijuana would be distributed to MACKESY's customers.

During MACKESY's tenure with HUGHES, S-4 stated that MACKESY met several of HUGHES's workers including "Tony." S-4 identified a photo of Jose Antonio VILLAREAL-ULLOA, a.k.a. Tony HERNANDEZ, as "Tony." S-4 stated that "Tony" was a money courier for HUGHES. "Tony" would hide loads of $400,000.00 in the panels of a vehicle and drive the

cash into Mexico. HUGHES often talked to MACKESY about his source of supply for marijuana.
HUGHES stated to MACKESY that the marijuana came from Miguel Angel CARO-QUINTERO.
Mackesy never received any marijuana from Rafael CARO-QUINTERO. When Mackesy came
into the picture, Rafael CARO-QUINTERO was already under arrest and in official confinement.

S-4 stated that HUGHES often pressured MACKESY for money to provide to Miguel
Angel CARO-QUINTERO for investment purposes. HUGHES said the money was to provide
CARO-QUINTERO capital for legitimate businesses. MACKESY visited HUGHES in Mexico
on several occasions. S-4 thinks that between 1985 and 1986, MACKESY received all of the
marijuana that HUGHES was moving to the U.S. In or about 1985 through 1986, S-4 was
introduced to Mark WINTER by Mark ZAPLIN at an art show at the Santa Fe Hilton Hotel. S-4
remembers ZAPLIN telling him that WINTER was holding valuable rugs for HUGHES.

In or about late 1987, HUGHES airlifted four loads of marijuana into the Utah-Arizona
desert near St. George, Utah. The loads came in two sections. One section was in or about late
November, two nights in a row. The second section was in or about early December, also two
nights in a row. All of the loads are believed to have been piloted by Gregory PETTIJOHN. The
marijuana from the November loads was driven to MACKESY's stash house operated by YATES
on Sheridan Boulevard in Westminster, Colorado. The first night's load was driven by Brian
BAILIA. The second night's load was driven to the same stash house in Colorado by Kerry
TROY. The first December load of marijuana was driven out of St. George by Brian BAILIA. S-
4 said that BAILIA was to drive the load to Colorado, inventory the load and then drive the load to
Eugene GRASS's customers on the East Coast. The plan was interrupted.

BAILIA was arrested at a roadblock near Green River, Utah with the load of marijuana. Kerry TROY drove the second December load to YATES's stash house. This load was stolen from the stash house in or about late December 1987. According to S-4, these were the last loads that MACKESY did with HUGHES.

Then in or about 1989, MACKESY received a message from an unknown person that HUGHES was in prison in Mexico and that HUGHES needed cash. MACKESY agreed to provide the person with $50,000.00 so that the cash could be relayed to HUGHES in Mexico. In late summer 1989, MACKESY met the unknown person in San Francisco, California and MACKESY gave him $50,000.00. S-4 recalled that on one other occasion MACKESY and Ronald FISHMAN sent $500,000.00 to HUGHES in Mexico to pay for marijuana. FISHMAN had the money in Boulder, Colorado, and one of FISHMAN'S drivers took it to Tucson, Arizona where the money was given to an unknown subject. S-4 stated that this payment was sent to Mexico before HUGHES went to prison in Mexico.

In May 1990 and on several occasions thereafter, a cooperating source of information (hereinafter referred to as S-3) was interviewed concerning the narcotics trafficking activities of Robert MACKESY and associates. S-3 has provided information which has been corroborated during this investigation. S-3 advised Government investigators that S-3 has been involved with Robert MACKESY and has assisted him in the furtherance of the marijuana business since 1980. In assisting MACKESY in the marijuana business, S-3 has acted as a driver and deliveryman of marijuana, sometimes picking up the marijuana from various points in the United States and transporting it to Colorado.

Government investigators learned from S-3 that S-3 picked up loads of marijuana in St. George, Utah, on several occasions in late 1987 and drove these loads of marijuana to Colorado. S-3 told Government investigators that S-3 can recall transporting loads of marijuana of at least 1,000 pounds in or about September through December 1987. Government investigators have reviewed hotel records of various hotels in or about St. George, Utah corroborating the information given by S-3. Government investigators were told by S-3 that S-3 was notified by an unknown co-conspirator that a load of marijuana had been seized somewhere in Utah in or about early December 1987. S-3 stated that S-3 was in St. George, Utah, awaiting delivery of another load when the load was seized. S-3 stated that S-3 had knowledge that the seized load was the property of Robert MACKESY and that the load had just left St. George, Utah.

Government investigators learned from S-3 that from S-3's experience in dealing with Robert MACKESY, S-3 knew that the load seized in Utah was from the same common source as all of the loads hauled out of St. George, Utah for MACKESY. Government investigators confirmed through another source of information that the load seized in Utah during December 1987 came from HUGHES and MIGUEL CARO-QUINTERO. S-3 stated that S-3 did not personally know the source of the marijuana but knew that the marijuana was being flown into the United States from Mexico. S-3 told Government investigators that S-3 believed that the aircraft was landing at a clandestine airstrip in the desert and that the marijuana was then off-loaded and taken to a stash location in St. George, Utah.

On March 22, 2001, Government investigators met with a source of information hereinafter referred to as S-5, in Denver, Colorado, to interview S-5 in relation to Miguel Angel CARO-QUINTERO's and HUGHES's drug trafficking activities. S-5 told Government

Page 24 of 34

investigators that HUGHES was a pilot and HUGHES's brother, Donald HUGHES, owned a

Cessna dealership in California. HUGHES was well established as an air smuggler and drug

trafficker before HUGHES met Miguel Angel CARO-QUINTERO. In 1967 HUGHES started

flying to Mazatlan, Mexico in a Cessna aircraft. In Mazatlan HUGHES would purchase from the

Mexican traffickers 250 to 300 kilograms of marijuana and fly the marijuana back to California.

The marijuana was sold to John and Henry CAPPELA in California.

   HUGHES did this for several years until HUGHES was arrested in Mexico in January 1969

for possession of 500 kilograms of marijuana. HUGHES spent 21 months in prison in Hermosillo,

Mexico. While in prison HUGHES met Thomas TAYLOR, a.k.a. SUMMERS, and Chato

SANTUNAS, who was a politician in Guadalajara, Mexico. SANTUNAS was involved with

another individual named Baldomero HOLGUIN. After HUGHES's release from prison, HUGHES

flew into the United States about five to six loads of marijuana of approximately 500 pounds each

with these individuals.

   In 1970 HUGHES also met Wayne BROWN. BROWN paid HUGHES $10,000.00 a trip

to fly loads of approximately 250 to 300 kilograms of marijuana to a small airstrip near Blythe,

California. The loads were delivered to James THOMA and Everett WELBER. HUGHES flew for

BROWN for a couple of years and made about 10 trips. Also during the years 1971 to 1973

HUGHES met two Mexicans in Mexicali, Mexico named Juvenile DIAZ and Jose GUITON.

DIAZ and GUITON got HUGHES involved in sending vehicles loaded with small bricks of

marijuana in the trunks across the border of Calexico, Mexico to El Centro, California. They

would send three to four vehicles across a day with approximately 250 pounds of marijuana in

each vehicle. The vehicles would travel to Los Angeles and Ventura, California, where the

marijuana was delivered to Gerald CUMMINGS, Walter ANDERSON, Stephen THOMA, Keith

HICKENBOTTOM and Mike HUITRON. S-5 estimated that during this two-year period 30 to 40

tons of marijuana was delivered to these individuals.

S-5 said that in 1973 HUGHES, Juan ESPARRAGOZA and TAYLOR started growing their

own marijuana in Mexico. The first grow was near Pericos, Mexico and yielded approximately 30

tons of marijuana on 20 hectares. HUGHES, ESPARRAGOZA and TAYLOR each received 10

tons. HUGHES continued to grow marijuana from 1973 and 1980 in the Mexican States of

Sonora, Sinaloa, and Chihuahua. HUGHES became a partner with CUMMINGS, who had several

major buyers in the United States and Canada. The marijuana was loaded into VW trucks at 300

to 400 pounds each and driven through Baja, Mexico to Tijuana, Mexico where it crossed into the

United States. CUMMINGS introduced HUGHES to David and Brian ORTIZ, who were major

buyers of the marijuana.

In 1980 HUGHES fled to Mexico from Baltimore, Maryland and retired from the drug

business for a short time. HUGHES made a trip to Peru where HUGHES purchased 100 to 120

kilograms of cocaine paste. HUGHES brought the paste back to Mexico where ESPARRAGOZA

and Miguel FELIX-Gallardo wanted to learn how to convert the paste to cocaine HCL. HUGHES

brought back a Peruvian to teach them how to convert the cocaine. HUGHES received 12

kilograms of the cocaine for personal use and to give to his friends.

In 1983 HUGHES met Rene VERDUGO, who had just been released from prison, through

TAYLOR. VERDUGO was a close associate of Rafael CARO-QUINTERO. TAYLOR at the

time wanted VERDUGO to transport 50 tons of Thai marijuana from Manzanillo to Mexicali to

San Luis and into the United States. VERDUGO started using a helicopter to fly the marijuana

into the United States. The Thai marijuana belonged to ANDERSON, ESPARRAGOZA, and TAYLOR. S-5 estimated that VERDUGO smuggled about 186,000 pounds in a 2-month period. During this time VERDUGO wanted to introduce HUGHES to Rafael CARO-QUINTERO, but it wasn't until about 1984 when HUGHES met Rafael CARO-QUINTERO in a restaurant in Guadalajara, Mexico.

Eventually, Rafael CARO-QUINTERO was arrested in Mexico and Miguel Angel CARO-QUINTERO assumed a more important role in the CARO-QUINTERO organization. Eventually, VERDUGO was arrested in the United States. The day VERDUGO was arrested in the United States, VERDUGO had invited HUGHES to the wedding of Alberto SICLIA-Falcon, a friend of VERDUGO. HUGHES had driven down to the wedding, but VERDUGO did not show up. The next day HUGHES learned that VERDUGO was arrested in the United States. After learning VERDUGO was arrested, Miguel Angel CARO-QUINTERO told HUGHES that HUGHES was going to Caborca, Mexico with Miguel Angel CARO-QUINTERO.

After HUGHES was taken to Caborca, Mexico by Miguel Angel CARO-QUINTERO, HUGHES began delivering marijuana to Robert MACKESY and Joe OTTER for Miguel Angel CARO-QUINTERO. Routinely, the marijuana was flown into the United States by pilots HUGHES hired: GREGORY PETTIJOHN, KIM and CRAIG PASSWAITER. HUGHES worked with Miguel Angel CARO-QUINTERO until the time of HUGHES's arrest in Mexico. During this period S-5 estimates that HUGHES sold about 100 to 200 tons of marijuana for Miguel Angel CARO-QUINTERO and over 100 million dollars was delivered to HUGHES for Miguel Angel CARO-QUINTERO. S-5 said that during HUGHES's trafficking activities

HUGHES paid off numerous Mexican officials including high-ranking military and law enforcement officials.

On October 10, 2001, Government investigators interviewed S-5 about the illegal drug trafficking business activities involving HUGHES and Miguel Angel CARO-QUINTERO. S-5 provided Government investigators a sworn statement indicating that the marijuana HUGHES's workers smuggled from Mexico into the United States from about 1985 to 1989 came from Miguel Angel CARO-QUINTERO. More than 80 tons of marijuana was involved. S-5 identified a photograph of Miguel Angel CARO-QUINTERO as the person that HUGHES obtained his marijuana from during this period. The Government expects that testimony conveying similar information from another cooperating individual will be presented at the sentencing hearing to establish the scope and extent of the defendant's marijuana cultivation and distribution enterprise if such testimony appears necessary.

## IV. SENTENCING COMPUTATION

The parties understand that sentencing in this case will be determined by the Court through the application of 18 U.S.C. § 3553(a) factors and in light of the advisory United States Sentencing Guidelines (USSG), issued pursuant to 28 U.S.C. § 994(a). This plea agreement relies mainly upon the 2009 edition of the advisory Guidelines. The parties acknowledge that earlier editions of the advisory Guidelines may have some application due to dates of alleged relevant offense conduct.

The parties understand that the Court may impose any sentence, up to the statutory maximum sentence, regardless of any Guideline range computed, and that the Court is not bound by any position of the parties. USSG § 6B1.4(d). The parties understand that the Sentencing

Guidelines are advisory.  The Court is free, pursuant to USSG §§ 6A1.3 and 6B1.4, to reach its

own findings of facts and sentencing factors considering the parties' stipulations, the presentence

investigation, and any other relevant information.  USSG § 6B1.4 comment; USSG § 1B1.4.  To

the extent the parties disagree about the sentencing factors, it is the intention of the parties that the

computations below identify the factors that are and are not in dispute.  USSG § 6B1.4(b).

      A.     The parties understand that the Sentencing Guidelines are advisory in nature and, as

such, not binding on the Court.  For the purposes of this plea agreement, the calculations presented

rely mainly on the terms and provisions of the 2009 U.S. Sentencing Guidelines Manual.  The

parties understand that, due to the age of the case and the timing of some of the allegedly related

underlying activity, different editions or versions of the Guidelines may be relied upon by the

parties.  U.S. Sentencing Guidelines Section 2E1.1(a)(2) for RICO offenses  provides that the

offense level applicable is determined by the underlying racketeering activity.   In this case, the

underlying activity is illegal drug trafficking.  For the purposes of determining the base offense

level pursuant to § 1B1.3 and § 2D1.1, the 2009 Guidelines provide for a base offense level of **38**

when offense involves at least 30,000 kilograms of marijuana.  The government contends that the

defendant was persistently involved in extensive Marijuana cultivation and distribution activity

involving more than 100,000 kilograms of marijuana.  The defendant contends that the amount of

marijuana involved, as supported by credible evidence, is far less than 30,000 kilograms and

reserves the right to advocate for a lower base offense level.  If the Court makes findings that the §

1B1.3 relevant offense conduct exceeds 30,000 kilograms of marijuana, the base offense level will

be level **38**.

B.      The Government asserts there should be an upward role in the offense adjustment

of four levels for this defendant based on this defendant's leadership position in the organization.§

3 B1.1   The defense reserves the right to advocate for a lower level adjustment, for no adjustment,

and for a reduction of role in the offense. § 3B1.2  According to the Government, the adjusted

offense level would then be **42**.

C.      The Government asserts there should be a two point offense level increase for the

possession of a firearm pursuant to USSG § 2D1.1(b)(1), raising the offense level to **44**.  The

defense reserves the right to oppose such an adjustment.  In part, the defense contends that the

possession of firearms in Mexico, if supported by credible evidence, would not support the

adjustment.  If the defense is correct, the resulting offense level remains **42**.  The Government

asserts that there should be a two level increase pursuant to §2D1.1(b)(3) because an aircraft other

than a regularly scheduled commercial air carrier was used to import marijuana into the United

States.  If the Court determines that the Government is correct and finds that the §2D1.1(b)(3)

adjustment applies, the offense level, according to the Government, is **46**.  The defense reserves

the right to oppose such an adjustment by argument, evidence and otherwise; in part the defense

would direct the Court's attention to the December 3, 1987, date of the alleged use of an aircraft in

Count 7; the 1988 Sentencing Guidelines do not provide for a two level adjustment for the use of

an aircraft.  If the defense is correct with respect to the application of a firearm's enhancement and

the application of an enhancement for the use of an aircraft, the offense level would remain a level

**42**.

D.      The Defendant does not qualify for a further "safety valve" adjustment because he

has not truthfully debriefed with the government and he occupies a position of leadership. USSG

§5C1.2. The offense level remains **46** according to the Government and **42** according to the defense.

      E.      Pursuant to USSG § 3E1.1(a), defendant has clearly demonstrated acceptance of responsibility for the drug related charges to which he pleads. The Government respectfully asserts that the defendant should receive a three-level downward adjustment -- resulting in an offense level of **39** according to the defense and **43** according to the government.

      F.      The parties understand that the defendant's criminal history computation is tentative. The criminal history category (CHC) is determined by the Court. At this stage, it appears that the defendant has a limited criminal history, resulting in a CHC of I.

      G.      The maximum statutory sentence for Count One is 20 years (**240** months) of imprisonment. The maximum period of imprisonment on Count One of the Rule 20 transfer case is five years (60 months) of imprisonment. Pursuant to this plea agreement, the Government is recommending a combined sentence for the Arizona and Colorado counts of conviction. The Government here states that the Government will advocate for a sentence to include a period of imprisonment of 20 years (**240** months). The defense reserves the right to advocate for a lower sentence. Pursuant to Rule 11(c)(1)(C), if the Court determines that a sentence greater than 20 years imprisonment is called for upon the two counts of conviction based on the application of 18 U.S.C. § 3553(a) principles in the circumstances of this case, the Defendant shall be permitted to withdraw his pleas of guilty if he chooses to do so and the parties may proceed to trial. If the Defendant withdraws his pleas of guilty, the Rule 20 transfer case will be returned to the District of Arizona by operation of Rule 20. The Guideline range resulting from the estimated offense level of **43**, and the tentative CHC of I, is Life. As a condition of the

defendant's extradition, the Government provided assurances to the government of Mexico that the defendant would not be sentenced to Life. Pursuant to treaty between the United States and Mexico, the Defendant may not be sentenced to Life imprisonment. The Guideline range resulting from the estimated offense level of **39**, and the tentative CHC of I, is 262 to 327 months. However, in order to be as accurate as possible, with the CHC undetermined at this time, the estimated offense level of 39 could conceivably result in a range from 262 months (bottom of Category I with a base offense level of 39) to Life imprisonment (top of Category VI with a base offense level of 39).

 H. Pursuant to USSG § 5E1.2 and 21 U.S.C. § 841(b)(1)(D) and 18 U.S.C. §§ 1961, 1962 and 1963, assuming an offense level of 38 or above, the fine range for this offense is $25,000.00 to $250,000.00 plus applicable interest and penalties.

 I. Pursuant to 18 U.S.C. § 3581, Count One of the Superseding Indictment in the Colorado case alleges a Class B felony. Pursuant to Title 18 U.S.C. § 3583, the Court may impose a term of supervised release of five (5) years or less on said Count One. The Government will ask for supervised release for a period of five (5) years. The defense reserves the right to ask for a shorter period of supervised release. Pursuant to 21 U.S.C. § 841(b)(1)(D), the Court must impose a period of supervised release of at least two years on Count One of the Rule 20 Arizona case.

## V. <u>WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE</u>

 The parties believe the sentencing range resulting from the proposed plea agreement is appropriate because all relevant conduct directly attributable to this defendant is disclosed, the sentencing guidelines will take into account all pertinent sentencing factors with respect to this

defendant, and the charges to which the defendant has agreed to plead guilty adequately reflect the seriousness of the actual offense behavior.

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

The offer represented by the transmission of the proposed plea agreement in this case is withdrawn unless the defendant, on or before June 20, 2009, indicates his intention to accept the plea agreement by filing a notice of disposition and a request for a change of plea date, signs a Rule 20 consent form to transfer the District of Arizona case, and further requests leave of Court to withhold or suspend any pretrial defense motions until the change of plea date. If the change of plea does take place and the Court accepts the plea of guilty to Count One of the Colorado case and Count One of the Rule 20 transfer case, any such pretrial motions shall be deemed moot thereafter.

IT IS SO AGREED:


Miguel Angel Caro Quintero  10/6/09
MIGUEL ANGEL CARO-QUINTERO          Date
Defendant



_____     _____
WALTER B. NASH III                  Date
Attorney for the Defendant

_____     _____
JOHN M. RICHILANO                   Date
Attorney for the Defendant

_____     _____
STEPHEN G. RALLS                    Date
Attorney for the Defendant

_____     _____
GLENN ALEXANDER                     Date
JOHN GILLIES
JIM FAULKNER
Trial Attorneys
Attorneys for the Government

_____     _____
GUY TILL                            Date
Assistant U.S. Attorney
Attorney for the Government

_____     _____
SUSAN (ZEKE) KNOX                   Date
Assistant U.S. Attorney
Attorney for the Government

_____     _____
MARK J. BARRETT                     Date
Assistant U.S. Attorney
Attorney for the Government

Page 34 of  34

# CERTIFICATE OF TRANSLATION

I, Bety Ziman, hereby certify that the previous attached document is an accurate translation of the following-attached document and that I am competent to render such translation in English and Spanish.

The undersigned translator is a Certified Federal Interpreter, Certificate number 02-023, is certified by LionBridge Federal as a Spanish/English, Hebrew/English Interpreter and evaluator, and by the National Consortium of State Courts, registration number 07-70 is the holder of a certificate from the University of the Arizona Institute of Court Interpretation, as well as from the Institute for Interpreters and Translators in Monterey Cal., and is a member of the National Association of Judicial Interpreters and Translators, of the American Translators Association, and of the Colorado Association of Professional Interpreters

Signature: _____        Date: ___9/17/09_____

Bety Ziman
255 S. Holly St..
Denver, CO 80246